## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

CAROLE ANN ASKINS,      :
                            :

          Plaintiff     :     No. 3:13-CV-2415
                            :

         vs.         :     (Judge Nealon)
                            :

CAROLYN W. COLVIN, Acting  :
Comissioner of Social Security,  :
                            :
         Defendant    :

**FILED**
**SCRANTON**

OCT 3 1 2014

PER _____
         DEPUTY CLERK

## MEMORANDUM

On September 9, 2013, Plaintiff, Carole Ann Askins, filed this instant

appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner

of the Social Security Administration ("SSA") denying her application for

supplemental security income ("SSI")  under Title XVI of the Social Security Act,

42 U.S.C. § 1381 et seq.  (Doc. 1).  The parties have fully briefed the appeal, and

the matter is now ripe for review.  For the reasons set forth below, the decision of

the Commissioner denying Plaintiff's applications for SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

**BACKGROUND**

Plaintiff protectively filed[2] her application for SSI on January 13, 2010. (Tr. 20).[3] This claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on July 22, 2010. (Tr. 20). On August 2, 2010, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 20). A hearing was held on February 6, 2012, before administrative law judge Sharon Zanotto ("ALJ"), at which Plaintiff and vocational expert Paul Anderson ("VE") testified. (Tr. 20). On February 24, 2012, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff's impairments did not meet or medically equal any impairment Listing, and she could perform a full range of light work with a lifting maximum of ten (10) pounds, a sit/stand option that will allow her to change positions every half hour, rare overhead reaching with her non-dominant upper extremity, frequent fingering and feeling, occasional kneeling and climbing ramps and stairs, avoidance of concentrated

2. Protective filing is a term for the first time an individual contacts the SSA to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on January 22, 2014. (Doc. 11).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the SSA.

exposure to dust, fumes, odors, gases, chemicals, and high temperatures, and a small group limitation of up to five (5) people. (Tr. 24).

On April 30, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 14). On May 28, 2013, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 8-11). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on September 9, 2013. (Doc. 1). On January 22, 2014, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 10 and 11). Plaintiff filed the brief in support of her complaint on March 6, 2014. (Doc. 13). Defendant filed a brief in opposition on April 10, 2014. (Doc. 13). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on August 5, 1963, and at all times relevant to this matter was considered a "younger individual."[5] (Tr. 300). Plaintiff obtained her GED and Certified Nurse's Assistant ("CNA") certificate, and can communicate in English. (Tr. 60-61, 300). Her employment records indicate that

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

she previously worked as a candy packer, a CNA, and a custodial engineer.  (Tr.

281, 349).  The records of the SSA reveal that Plaintiff had earnings in the years

1980 through 2007.  (Tr. 274).  Her annual earnings range from a low of no

income to a high of fourteen thousand seven hundred dollars and sixty-five cents

($14,700.65) in 1999.  (Tr. 274).

Plaintiff's alleged disability amended onset date is January 13, 2010.  (Tr.

22).[6]  The impetus for her claimed disability as noted in her Disability Report and

testified to at her administrative hearing is a combination of the following:

Chronic Obstructive Pulmonary Disease ("COPD"), Degenerative Joint Disease

("DJD")[7], Attention Deficit Hyperactivity Disorder ("ADHD"), a left hip

replacement, anxiety, depression, and Obsessive Compulsive Disorder ("OCD").

(Tr. 304).  Plaintiff completed an Adult Function Report on March 17, 2010.  (Tr.

328).  She indicated that she was living "house to house" with different family

members.  (Tr. 328).  A typical day involved waking up, eating breakfast,

watching television, taking her medicine, performing light housekeeping, resting,

---

6. At the administrative hearing on February 6, 2012, Plaintiff's original alleged
onset date of March 8, 2008 was amended to January 13, 2010.  (Tr. 57).

7. It is noted that "DJD" and "arthritis" are used interchangeably throughout
Plaintiff's medical records, as both are terms that refer to one condition formally
known as "osteoarthritis."  http://www.healthline.com/health/osteoarthritis, last
updated August 13, 2014.

4

eating lunch, reading, eating dinner, and going to bed. (Tr. 328). She did not take care of other people or pets. (Tr. 329). The pain interrupted her sleep, but Plaintiff did not indicate that it affected her ability to take care of her personal needs. (Tr. 329). Without help, encouragement, or accompaniment, Plaintiff went to the grocery store once a week, prepared meals daily for twenty-five (25) minutes at a time, did the laundry once a week for two (2) hours, cleaned three (3) times a week for one (1) hour, went outside three (3) times a week, drove a car, and went shopping two (2) times a week for two (2) hours. (Tr. 328, 330-331). She indicated that she was unable to walk more than two (2) to three (3) blocks before needing to rest for ten (10) to fifteen (15) minutes before resuming walking. (Tr. 333). She reported that she could not lift more than ten (10) pounds, and could not squat, bend, or kneel because of her hip replacement. (Tr. 333).

Regarding concentration and memory, Plaintiff was able to take care of her personal needs and take her medicine without reminders. (Tr. 330). She was able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 331). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, understanding, following instructions, or using hands. (Tr. 333). She indicated that she could not pay attention for "very long," and could follow written and spoken instructions

"well." (Tr. 333).

Socially, Plaintiff talked on the phone, visited her family, and went shopping with her niece three (3) times a week. (Tr. 332). She indicated that she was not very social, was always depressed, and tired easily due to her medical conditions. (Tr. 333). With regards to hobbies and interests, Plaintiff liked to do puzzles, read, watch television, and spend time with family members. (Tr. 332). She indicated that she did not always get along well with others, and that she did not handle stress or changes in routine well. (Tr. 334).

Plaintiff also filled out a Supplemental Function Questionnaire. (Tr. 336). She stated that her pain began in 2005 due to the DJD, which became worse over time, and that she also started experiencing further pain due to depression. (Tr. 336). She stated that because of her pain, she was unable to sit, stand, or walk for any extended period of time, and that her legs constantly throbbed "24 hours a day." (Tr. 336). The pain would sometimes spread to her neck and feet, and was worsened by lifting and sitting too long. (Tr. 336). It was also worse at the end of the day depending on what activities Plaintiff engaged in that day. (Tr. 336). She indicated that she took Vicodin to control the pain, and that it did not always relieve the pain. (Tr. 337). The medicine caused the side effects of nausea, diarrhea, and constipation. (Tr. 337). Plaintiff reported that she did physical

therapy in the hospital after her hip replacement surgery, and that she was not referred for mental health treatment to help her cope with pain. (Tr. 337).

Plaintiff's niece, Kristine Askins, filled out a Third Party Function Questionnaire in March of 2010. (Tr. 320). She indicated that she had known Plaintiff for twenty-nine (29) years, would spend three (3) days a week with her, and would help get her out of the house and to the grocery store. (Tr. 320). She stated that Plaintiff laid in bed due to pain and depression, but would engage in light cleaning, preparing meals, ironing, and folding clothes. (Tr. 320, 322). She indicated that Plaintiff was able to go out alone, and that her hobbies and interests included reading, watching television, and doing puzzles. (Tr. 320-326). She indicated that Plaintiff did not socialize much because she could not do a lot of activities that required movement. (Tr. 325). She indicated that the following activities were affected by Plaintiff's impairments: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, and concentration. (Tr. 325). She reported that Plaintiff experienced panic attacks and anxiety, and had a fear of her medical conditions. (Tr. 326).

At her February 6, 2012 hearing, Plaintiff testified that she was disabled based on the following impairments: COPD, arthritis, DJD, a left shoulder tear, drug addiction, costochondritis, osteoporosis, Grave's disease, anxiety, and

7

Obsessive Compulsive Disorder ("OCD").  (Tr. 56, 64, 76-78,83, 85, 89, 99, 103-104).  She stated that the COPD caused her shortness of breath.  (Tr. 56).  She indicated that she used to smoke a pack a day, and that she had cut down to about five (5) cigarettes a day, despite her doctor's recommendation to quit completely.  (Tr. 57).  There was an inconsistency from Plaintiff's function report regarding whether she drove, and she clarified that she did not drive, but rather rode in the car with others.  (Tr. 59).  She testified that her grandchildren, ages three (3) years and six (6) months, would visit her one (1) day a week for approximately a half hour at a time, but she was unable to be alone with them because she could not lift them.  (Tr. 62, 83-84).  She went shopping with her niece three (3) times a week, and would use a motorized cart in the grocery store.  (Tr. 62, 95).  Plaintiff was able to do laundry in terms of putting it into the washer and dryer, but was unable to lift a basket of laundry.  (Tr. 84).  She liked to read, but was only able to read for a few minutes at a time as she had difficulty sitting for extended periods.  (Tr. 95-96).  She testified that she didn't have a job, didn't volunteer, and didn't belong to any organization, club or group.  (Tr. 63).

She stated that the pain from the DJD was what had primarily affected her ability to work, and that she had arthritis in the majority of her joints.  (Tr. 64).  She testified that her pain was most severe in her upper left leg in the hip area and

8

right knee, and that it was also constant. (Tr. 65, 71). She also experienced pain

in her hands and feet. (Tr. 89). The pain in her joints caused an inability to get

out of bed two (2) to three (3) times a week until about one o'clock (1:00) in the

afternoon, when normally she would get out of bed at nine o'clock (9:00) in the

morning. (Tr. 88-90). Medication would help dull the pain for about two (2)

hours, but it made her feel dizzy, light-headed and nauseous, and as a result,

Plaintiff would have to lay down for about an hour to an hour and a half. (Tr. 65,

68).

　　　　She experienced lung pain from the costochondritis and COPD. (Tr. 86).

Plaintiff rated her pain at a six (6) to seven (7) on a scale of ten (10), and testified

that the pain was not constant. (Tr. 86). In addition to the pain medication she

took for her DJD, Plaintiff took Flexeril to aid in relaxing the chest wall muscles

in order to aid her lung pain. (Tr. 86). She did nebulizer treatments four (4) times

a day for fifteen (15) minutes at a time. (Tr. 90).

　　　　Regarding limitations resulting from these impairments, Plaintiff testified

that she was only able to sit for fifteen (15) to thirty (30) minutes at a time due to

worsening pain, and then she would stand up and stretch out for relief, but she

could only stand for about fifteen (15) to thirty (30) minutes due to worsening

pain, at which time she would alternate back to a seated position for relief. (Tr.

9

69-70).  She also was unable to kneel, squat, and bend because it caused pain in her legs and an inability to get back to an upright position.  (Tr. 79).  She had issues climbing stairs due to difficulties with her breathing, left leg, and right knee, and testified that she had fallen approximately five (5) times over a one year period while climbing stairs due to these problems.  (Tr. 80, 84).  The tear in her left shoulder caused a lifting limitation of ten (10) pounds maximum and difficulty with overhead reaching.  (Tr. 78).  Her lung impairments caused her to have issues with dust, fumes, odors, gases, chemicals and hot temperatures.  (Tr. 81-82).  She testified that she did not have difficulties getting along with others, but had social anxiety in setting of more than three (3) or four (4) people.  (Tr. 63, 80).

## MEDICAL RECORDS

On January 5, 2010, Plaintiff was seen by Dr. Joshi for lower back pain that had been occurring for four (4) days.  (Tr. 517).  She was noted as having COPD. (Tr. 517).  Plaintiff reported that she had also been experiencing fatigue, headaches, and a productive cough.  (Tr. 517).  She was prescribed Azithromycin for an infection.  (Tr. 518).

On January 15, 2010, Plaintiff had an appointment at Pinnacle Health in Harrisburg, Pennsylvania for a medical check-up.  (Tr. 513).  She was noted as having a history of subclinical hypothyroidism with concomitant Grave's disease,

moderate COPD, back pain, and a left hip replacement. (Tr. 513). She stated that she smoked one (1) pack of cigarettes every three (3) days. (Tr. 513). Her exam stated she had anxiety, difficulty breathing that was better with Symbicort and Combivent, had difficulty sleeping, had stabilized hip pain, and hot flashes. (Tr. 513). Plaintiff was told to continue her medications, including Symbicort, Combivent, Spiriva, Synthroid, Naproxen, and Vitamin D, and a Pulmonary Function Analysis was ordered. (Tr. 514).

On January 19, 2010, Plaintiff had an appointment with John Mira, M.D. at T.W. Pontessa & Associates. (Tr. 503). She was diagnosed with Major Depressive Disorder that was moderate and recurrent, cocaine and cocaine abuse problems, and ADHD. (Tr. 503). At the time of her appointment, Plaintiff was homeless and moving from house to house of her family members, kept to herself most of the time, attended two (2) to three (3) Alcoholics Anonymous ("AA") meeting per week, was financially strained, and was taking Prozac. (Tr. 503). Her GAF score at this visit was fifty-five (55). (Tr. 503). She reported that her last crack cocaine use was on December 27, 2009, and that she had been using marijuana and alcohol. (Tr. 504). She denied suicidal and homicidal ideations. (Tr. 504). Plaintiff did not sign the treatment plan consent form. (Tr. 504).

On January 20, 2010, Plaintiff underwent a Pulmonary Function Analysis

11

performed by Franklin Myers, M.D. at Pinnacle Health. (Tr. 508). The test interpretation stated that Plaintiff had a normal vital capacity and flowrate with very mild obstruction, normal total lung capacity with air trapping, and a moderately decreased diffusion study. (Tr. 508).

On April 7, 2010, Plaintiff underwent a bone mass density test at Pinnacle Health's Fredricksen Diagnostic Department that was ordered by Kerry Whitelock, M.D. (Tr. 545). The results showed that Plaintiff had osteopenia in discs L1-L4 of her spine, and osteopenia and osteoporosis in her right femur. (Tr. 545).

On April 19, 2010, Plaintiff underwent an MRI of her left shoulder that was ordered by Timothy Ackerman, D.O. (Tr. 724). The impression showed moderate supraspinatus and infraspinatus tendinopathy, and a suspicion for a tear at the base of the anterior glenoid labrum. (Tr. 724). On the same date, Plaintiff also had an x-ray of her right hip performed. This revealed a stable pelvis and right hip, and mild DJD of the right hip. (Tr. 725).

On May 11, 2010, Jennifer Wilson, D.O. completed an RFC assessment form for Plaintiff. (Tr. 554). Dr. Wilson gave Plaintiff a primary diagnosis of a left total hip replacement, a secondary diagnosis of thyroid disease, osteoarthritis, and COPD, and listed back pain as Plaintiff's other alleged impairment. (Tr. 554). Dr. Wilson opined that Plaintiff could occasionally lift and/ or carry twenty (20)

12

pounds, could frequently lift and/ or carry ten (10) pounds, could sit and stand

and/ or walk for six (6) hours in an eight (8) hour workday, had no limitations

pushing or pulling, and had no postural, manipulative, communicative, or visual

limitations. (Tr. 555-557). Dr. Wilson opined that Plaintiff did have

environmental limitations, including avoiding moderate exposure to extreme cold,

noise, and fumes, gases, odors, dust, and poor ventilation. (Tr. 557). Dr. Wilson

found Plaintiff's statements concerning her limitations to be only partially credible

due to her ability to carry out daily living activities. (Tr. 560).

On June 2, 2010, Plaintiff had an appointment with Dr. Presner for chest

congestion, a worsening cough, difficulty swallowing, a hoarse voice, and

headaches. (Tr. 752). Dr. Presner diagnosed Plaintiff with a COPD exacerbation

and prescribed Avelox. (Tr. 753).

On June 4, 2010, Dr. Joshi opined that Plaintiff was temporarily disabled

until September 4, 2010 due to hyperthyroidism, COPD, anxiety, arthritis, and a

recent fracture. (Tr. 562).

On June 30, 2010, Plaintiff had an appointment with consultative examiner

Louis Laguna, Ph.D. (Tr. 566). Dr. Laguna noted that Plaintiff stated that she

applied for disability mainly because of her physical impairments, but also

because she was being treated for anxiety and depression for which she had not yet

13

attended counseling. (Tr. 569). Plaintiff reported that she had abstained from crack cocaine use for the prior seven (7) months. (Tr. 570). Plaintiff stated that she had been experiencing fatigue, constant pain, difficulty concentrating, occasional hopelessness, and constant worry. (Tr. 571). Dr. Laguna noted that Plaintiff had psychomotor agitation. (Tr. 571). Based on Dr. Laguna's exam, Plaintiff's Axis I diagnostic impression included Dysthymic Disorder, Generalized Anxiety Disorder, and crack cocaine dependence with early full remission, her Axis II diagnostic impression was Personality Disorder, her Axis III diagnostic impression included a recent hip replacement, chronic pain, Grave's disease, and COPD, and her Axis IV diagnostic impression was occupational problems. (Tr. 572). Dr. Laguna gave Plaintiff a GAF of forty-five (45). Dr. Laguna opined that Plaintiff's ability to understand, remember and carry out instructions was not affected by her mental impairments, but that Plaintiff had a psycho-motor agitation and anxiety that caused a slight restriction in her ability to interact appropriately with the public, supervisors, and co-workers, and a slight restriction in her ability to appropriately respond to work pressures and changes in routine. (Tr. 566).

On July 14, 2010, Karen Weitzner, Ph.D. performed a Psychiatric Review Technique, and determined that it was necessary for her to complete a Mental RFC assessment form for Plaintiff based on the following categories: Listing 12.04

affective disorders, Listing 12.06 anxiety-related disorders, and Listing 12.09

substance addiction disorders. (Tr. 573, 577). With regards to the "B" criteria for

these three (3) Listings, Dr. Weitzner opined that Plaintiff had no restrictions of

activities of daily living, mild difficulties in maintaining social functioning,

moderate difficulties maintaining concentration, persistence or pace, and no

repeated episodes of decompensation, each of extended duration. (Tr. 587). She

also opined that evidence did not establish the presence of the "C" criteria for

Plaintiff's impairments under Listing 12.04 or Listing 12.06. (Tr. 588).

Dr. Weitzner then completed a Mental RFC assessment form on July 14,

2010 in order to assess Plaintiff's limitations resulting from the aforementioned

medically determinable mental health impairments Dr. Weitzner discussed in her

Psychiatric Review Technique of Plaintiff's then-present mental state. (Tr. 573).

This assessment was a current evaluation. (Tr. 573). Dr. Weitzner stated that the

medical evidence she reviewed established that Plaintiff had the following

medically determinable mental health impairments: Depressive Disorder, Anxiety

Disorder, Cocaine Dependence in early remission, and Polysubstance Abuse in

remission. (Tr. 575). Dr. Weitzner considered Dr. Laguna's examination findings

and reviewed Plaintiff's symptoms, and ultimately found Plaintiff to be partially

credible. (Tr. 575-576). Dr. Weitzner opined Plaintiff had no limitations

15

regarding her understanding and memory or regarding her social interaction ability, and was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting. (Tr. 573-574).

On July 22, 2010, Plaintiff had an appointment with Dr. Presner for problems related to her COPD and pain in her hip. (Tr. 756). Dr. Presner referred Plaintiff for an orthopedic referral for her left hip pain. (Tr. 758).

On July 22, 2010, Plaintiff also had an appointment for her increasing anxiety and compulsive symptoms with Dr. Mira. (Tr. 620). Plaintiff discussed her cocaine addiction, which caused several detox hospitalizations, and also how there were a number of times where she would stop using cocaine for two (2) to three (3) months at a time, but would then replapse. (Tr. 620). She stated that her anxiety and compulsive symptoms had increased, and that she was taking Prozac, which did not seem to be too helpful. (Tr. 620). At the time of this appointment, Plaintiff was living in a halfway house with a roommate in order to "try and pull things back together." (Tr. 620). She denied any suicidal or homicidal ideations, was eating and sleeping well, had panic attacks in large crowds, and would obsessively check values and numbers repeatedly to make sure they stayed the same. (Tr. 621). Dr. Mira stated that Plaintiff's Axis I Diagnostic Impression was

16

OCD and addiction to cocaine and stimulants with current remission, and her GAF was a fifty (50). (Tr. 621). Dr. Mira's treatment plan was for Plaintiff to attend individual therapy, and to begin Anafranil and Klonopin. (Tr. 621). Dr. Mira filled out a Pennsylvania Department of Public Welfare form for Plaintiff, in which he opined that Plaintiff was temporarily disabled for a period of twelve (12) months or less due to COPD, osteoporosis, arthritis, depression, compulsive behavior, ADHD and Vitamin D deficiency. (Tr. 604-606).

Plaintiff had another appointment with Dr. Mira on August 21, 2010. (Tr. 618). Plaintiff stated that she had better control over her OCD symptoms due to the Anafranil, but that she felt more angry. (Tr. 618). Dr. Mira restarted Plaintiff on the Prozac as a result. (Tr. 618). She reported that she was sleeping "exceptionally well," and denied any suicidal or homicidal ideations. (Tr. 618). Her GAF at this appointment was a fifty-five (55). (Tr. 618). Plaintiff was instructed to continue with individual therapy, Anafranil, and Prozac. (Tr. 619).

On September 14, 2010, Plaintiff had an appointment with Dr. Presner for coughing and chest congestion. (Tr. 761). At this point, she reported she was smoking five (5) to six (6) cigarettes a day. (Tr. 761). She was diagnosed with a COPD exacerbation, and was continued on her pulmonary medicines. (Tr. 762).

On September 21, 2010, Plaintiff presented to the ER at Harrisburg Hospital

due to chest pain, a cough and bronchitis. (Tr. 727). Plaintiff reported that she "smoked crack" the night before after being sober for nearly seven (7) months. (Tr. 728). Her history notes she had COPD, osteoporosis, anxiety, depression, and OCD. (Tr. 728). A chest x-ray was performed that showed findings consistent with hyperinflation with underlying COPD that was unchanged when compared to her x-rays taken on January 7, 2010. (Tr. 740). Plaintiff was diagnosed with bronchitis, and was prescribed Azithromycin and Prednisone. (Tr. 732, 735).

On October 18, 2010, Plaintiff had another appointment with Dr. Mira. (Tr. 616). Plaintiff was noted as doing very well with the Anafranil and Prozac. (Tr. 616). She was sleeping at night and eating well, and denied any suicidal or homicidal ideations. (Tr. 616). Her GAF at this appointment was a sixty (60). (Tr. 617). Plaintiff was instructed to continue with her medications and therapy. (Tr. 617).

On February 18, 2011, Dr. Taryham with Kline Health opined that Plaintiff was temporarily disabled until September 18, 2011 for a period of less than twelve (12) months due to depression, COPD, Grave's disease, osteoarthritis, OCD, social anxiety, and osteoporosis. (Tr. 639).

On March 11, 2011, Plaintiff had a follow-up appointment at T.W. Pontessa & Associates. (Tr. 615). She complained of increased anxiety, obsessive

18

compulsive behaviors, and racing thoughts. (Tr. 615). She was having difficulty sleeping at night, and would stay in bed until one o'clock (1:00) in the afternoon. (Tr. 615). She was more depressed, overwhelmed and frustrated, and reported feeling hyper. (Tr. 615). She denied suicidal or homicidal ideations, and her cognition and memory was listed as good. (Tr. 615). The treatment plan from this visit appears to be absent.

On April 13, 2011, Plaintiff had an appointment with Letitia Covaci, M.D. at T.W. Pontessa & Associates. (Tr. 613). Plaintiff's Axis I Diagnostic Impression from this visit included OCD, Bipolar II Disorder versus Major Depressive Disorder, Anxiety Disorder, and a history of cocaine and stimulant addiction in self-reported remission. (Tr. 613). She reported being able to fall asleep without difficulty, but that she would wake every hour to two (2) hours throughout the night. (Tr. 613). She was experiencing irritability, sadness and tiredness throughout the day, and requested to stop taking Seroquel. (Tr. 613). She denied feeling hopeless, helpless, or depressed, and denied any problems with her OCD. (Tr. 613). Dr. Covaci's examination noted Plaintiff's affect was overwhelmed and sad, but that her cognition and memory were good, and her judgment and insight were fair to good. (Tr. 613). Plaintiff's speech was normal, but she was anxious, hyper, and restless. (Tr. 613). Dr. Covaci decreased

19

Plaintiff's Seroquel dosage, discontinued Klonopin, prescribed Restoril, and refilled her Anafranil and Prozac prescriptions. (Tr. 614). She also recommended that Plaintiff continue counseling and return for a follow-up within four (4) weeks. (Tr. 614).

On May 11, 2011, Plaintiff underwent a chest x-ray for a cough ordered by Gwendolyn Poles, M.D. at Pinnacle Health's Polyclinic Diagnostic Department. (Tr. 623). The impression stated Plaintiff had mild biapical pleural thickening with no significant changes since her September 9, 2010 x-ray. (Tr. 623).

On June 14, 2011, Dr. Presner filled out a Physical RFC Questionnaire for Plaintiff. (Tr. 640). Dr. Presner stated that he had been Plaintiff's physician for two (2) years and five (5) months, that she had COPD, Chondritis, DJD, and osteoporosis, and that her prognosis was fair. (Tr. 640). He noted that Plaintiff's symptoms included chronic hip pain, and that she took Vicodin as a result. (Tr. 640). Dr. Presner opined that Plaintiff's impairments had lasted or were expected to last at least twelve (12) months, and that emotional factors contributed to the severity of Plaintiff's pain. (Tr. 640-641). Dr. Presner stated that Plaintiff had depression and anxiety that also affected her condition. (Tr. 641). Dr. Presner opined that Plaintiff was incapable of low stress jobs, was constantly in pain, that she could only sit for five (5) minutes at a time, stand for ten (10) minutes at a

time, and sit and stand/ walk for less than two (2) hours in an eight (8) hour workday. (Tr. 641-642). Dr. Prenser opined that Plaintiff would require five (5) periods of being able to walk around during an eight (8) hour workday for five (5) minutes each time. (Tr. 642). He opined that Plaintiff would frequently need to take unscheduled breaks during an eight (8) hour workday for fifteen (15) minutes at a time. (Tr. 642). Plaintiff did not require leg elevation or a cane or other assistive device. (Tr. 642). Dr. Presner opined that Plaintiff could only rarely lift and/ or carry less than ten (10) pounds, could only occasionally look down, turn her head, and/ or look up, could occasionally climb stairs, and had significant limitations with reaching, handling and fingering. (Tr. 642-643). Lastly, Dr. Presner opined that Plaintiff would likely be absent more than four (4) days per month as a result of her impairments or treatments. (Tr. 643). He also noted that Plaintiff's COPD would affect her ability to work at a regular job on a sustained basis. (Tr. 643).

On August 9, 2011, Amalakuhan Bravein, M.D., on a Pennsylvania Department of Public Welfare form, opined that Plaintiff was disabled for a period of twelve (12) months or more due to Grave's disease, chronic joint paint, and COPD. (Tr. 690).

On August 31, 2011, Plaintiff had an appointment with Dr. Covaci at T.W.

Pontessa & Associates. (Tr. 706). Her Axis I diagnostic impression remained the same as it was on her April 2011 appointment. (Tr. 706). Plaintiff reported that she had racing thoughts, mood swings, anxiety, irritability, and difficulty falling and staying asleep. (Tr. 706). She had remained sober. (Tr. 706). Dr. Covaci noted Plaintiff's affect was "full range," her cognition and memory were good, and she was cooperative, neat and well-groomed. (Tr. 706). Plaintiff's medications from this visit included Risperdal, Klonopin, and Anafranil. (Tr. 707).

On October 4, 2011, Plaintiff had a follow-up appointment with Dr. Covaci. (Tr. 708). Plaintiff reported that she was doing "good," and denied problems with depression, mood instability, sleep, and appetite. (Tr. 708). Her GAF from this visit was a sixty-five (65) to seventy (70). (Tr. 708). Her medications were refilled, and counseling was to be continued. (Tr. 709).

On October 10, 2011, Plaintiff had a follow-up appointment after a recent fall down her stairs. (Tr. 788). Plaintiff complained of right knee pain that occurred because of the fall. (Tr. 788). The treatment plan included a steroid shot, Naproxen, and Vicodin. (Tr. 789).

On November 16, 2011, Plaintiff was discharged from outpatient therapy and medical management at T.W. Pontessa & Associates due to failure to attend her therapy sessions. (Tr. 710). Her discharge diagnoses included OCD, Bipolar

22

II Disorder, Anxiety Disorder, and Polysubstance abuse history.  (Tr. 710).  Her

GAF was fifty-five (55).  (Tr. 710).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict

24

created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive SSI, the plaintiff must demonstrate he/she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905 (defining disability). Further,

> an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe[8] or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can adjust to other work in the national economy. Id.

As part of step four, when a claimant's impairment does not meet or equal a listed impairment, the Commissioner will assess residual functional capacity. See 20 C.F.R. § 416.920. Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg.

---

8. An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921.

34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

Using the RFC assessment, the Commissioner will determine whether the claimant can still perform past relevant work, or can make an adjustment to other work. Id. If so, the claimant is not disabled; and if not, he is disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

**ALJ DECISION**

At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful work activity from her amended onset date of January 13, 2010.  (Tr. 22).

At step two, the ALJ determined that Plaintiff suffered from the severe[9] combination of impairments of the following: "degenerative joint disease of the right knee and both hips, s/p left hip arthroplasty due to avascular necrosis, left shoulder tendinopathy, a mood disorder, anxiety, and COPD (20 C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 22).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 23).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work in a small group setting of up to five (5) people, with a ten (10) pound lifting maximum, a sit/stand option that allows her to change position every half hour, occasional kneeling and climbing ramps and

---

9.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

stairs, frequent fingering and feeling, rare overhead reaching with her non-dominant upper extremity, and avoidance of concentrated exposure to dust, fumes, odors, gases, chemicals, and high temperatures. (Tr. 24). In consideration of Plaintiff's RFC, the ALJ determined Plaintiff was unable to perform any past relevant work. (Tr. 26).

At step five, the ALJ found that given Plaintiff's age, education, work experience, and RFC, there were jobs that existed "in significant numbers in the national economy that Plaintiff could perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 27).

The ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the amended onset date of January 13, 2010, and the date of the ALJ's decision. (Tr. 28).

## DISCUSSION

On appeal, Plaintiff challenges the ALJ's RFC determination on several grounds, including: (1) the ALJ failed to properly evaluate the severity of her combination of impairments and their effect on her RFC, and the functional limitations included in the RFC were therefore not supported by substantial evidence; and (2) the ALJ erred in failing to give controlling weight to Plaintiff's treating physicians. (Doc. 13, pp. 6-10). Plaintiff also asserts that the ALJ's

hypothetical posed to the VE was improper because it set forth improper functional limitations. (Id. at 6, 11-12). Finally, Plaintiff argues that the ALJ erroneously interfered with the questioning by Plaintiff's attorney. (Id. at 13-14).

### 1.    Residual Functional Capacity Determination

#### a.    Severity of the Impairments and the Effect on the Functional Limitations Included in the RFC

Plaintiff argues that: (1) the ALJ improperly excluded a determination of the severity of several impairments from the RFC determination, including dysphagia, gastritis, hiatal hernia, and diverticulosis; and (2) the ALJ erred in determining the severity of the combination of Plaintiff's impairments, and the functional limitations included in the RFC were therefore unsupported by substantial evidence. (Doc. 13, pp. 6-8, 10-12).

With regards to Plaintiff's contention that the ALJ improperly excluded several impairments from the RFC determination, including dysphagia, gastritis, hiatal hernia, and diverticulosis, it is well-settled that "[t]here is no requirement that an ALJ consider impairments that a claimant does not allege are disabling." Podsiad v. Astrue, 2010 U.S. Dist. LEXIS 31636, *63-64 (D. Del. Feb. 22, 2010) (holding that plaintiff's obesity was not a reason to remand the case because plaintiff did not allege obesity in his application or at his hearing), citing

Rutherford v Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005).  Based on this
rationale, the ALJ did not have the obligation to address Plaintiff's dysphagia,
gastritis, hiatal hernia or diverticulosis because these impairments were not alleged
by Plaintiff in either the disability application or at the hearing.  As such, it is
determined that there is substantial evidence to support the ALJ's decision to not
address these impairments.

Furthermore, upon review of the record, it is determined that the ALJ did
not err in assessing the severity of Plaintiff's combination of impairments, and the
resulting functional limitations included in the RFC are supported by substantial
evidence.  "When assessing the severity of whatever impairments an individual
may have, the adjudicator must assess the impact of the combination of those
impairments on the person's ability to function, rather than assess separately the
contribution of each impairment to the restriction of his or her activity as if each
impairment existed alone."  Social Security Ruling 85-28, 1985 WL 56856, *3
(1985).  Additionally, an ALJ does not have the obligation to refer to and discuss
every single piece of evidence in the record that could impact the disability
determination.  See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

In the present case, the ALJ considered the impact the combination of
Plaintiff's impairments would have on her ability to function and Plaintiff's

subjective complaints in determining Plaintiff's RFC. (Tr. 23-26). Plaintiff

argues that her impairments and functional limitations were more severe than what

the ALJ determined. (Doc. 13, pp. 7-8, 11-12). However, as the ALJ discussed,

Plaintiff testified that she could lift ten (10) pounds, could sit and stand for thirty

(30) minutes at a time per each activity, could engage in overhead reaching with

her non-dominant hand, and could climb stairs several times a day. (Tr. 25, 69-70,

78). Regarding a fingering and feeling limitation, Plaintiff testified that her

impairments did not affect her hand use, and Dr. Presner opined that Plaintiff

could spend half of an eight (8) hour day fingering and feeling objects. (Tr. 333,

643, 646). The ALJ further discussed how Plaintiff reported that she could

prepare meals, perform light housework, launder clothes, care for her personal

needs, shop for groceries, pay bills, count change, use a checkbook, handle a

savings account, read, watch television, and spend time with her family. (Tr. 25,

328-332). Plaintiff's niece, in a Third Party Function Questionnaire, echoed

Plaintiff's statements regarding activities that she could perform. (Tr. 26, 322).

These activities that Plaintiff testified that she was capable of doing are in

complete accordance with the restrictions provided by the ALJ in the RFC

determination.

   In sum, upon review of the record, it is determined that the ALJ considered

the objective medical evidence, medical opinions, and Plaintiff's subjective complaints in determining the severity of Plaintiff's impairments, and accordingly formulated an RFC that was supported by the record. Therefore, the ALJ did not err in determining the severity of Plaintiff's impairments, and substantial evidence supports the functional limitations included in the RFC determination.

### b. Opinion Evidence

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of her treating physicians, and failed to provide an explanation for according these opinions limited weight. (Doc. 13, pp. 8-10). More specifically, Plaintiff contends that the ALJ should have afforded great weight to the opinion provided by Dr. Presner in the Physical RFC questionnaire, in which he opined that Plaintiff was disabled for a period of twelve (12) months or more, and provided the following functional limitations: (1) Plaintiff could sit for five (5) minutes at a time, stand for ten (10) minutes at a time, and sit and stand/ walk for less than two (2) hours in an eight (8) hour workday; (2) Plaintiff would require five (5) periods of being able to walk around during an eight (8) hour workday for five (5) minutes each time; (3) Plaintiff would frequently need to take unscheduled breaks during an eight (8) hour workday for fifteen (15) minutes at a time; (4) Plaintiff could only rarely lift and/ or carry less than ten (10) pounds; (5) Plaintiff

could only occasionally look down, turn her head, look up, and climb stairs; (6)

Plaintiff had significant limitations with reaching, handling, and fingering; and (7)

Plaintiff would likely be absent more than four (4) days per month as a result of

her impairments or treatments. (Tr. 640-643).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion."). When the treating physician's

opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ

may choose whom to credit in his or her analysis, but "cannot reject evidence for

no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the

ALJ's authority to determine which medical opinions he rejects and accepts, and

the weight to be given to each opinion. 20 C.F.R. § 416.927. Regardless, the ALJ

has the duty to adequately explain the evidence that he rejects or to which he

affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review."  In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

In the present case, the ALJ assigned limited weight to the opinion of the state agency physician, Dr. Wilson, because the medical record indicated Plaintiff was more limited than Dr. Wilson had opined.  (Tr. 25).  The ALJ also assigned limited weight to the "treating source opinions," namely Dr. Presner, Dr. Joshi, Dr. Mira, Dr. Taryham, and Dr. Bravein, that Plaintiff was temporarily disabled because these "sources" did not support "these opinions" and the "remainder of the record [did] not indicate the [Plaintiff was that] limited."  (Tr. 25).  More specifically, the ALJ assigned limited weight to Dr. Presner's opinion regarding Plaintiff's functional limitations because Dr. Presner did not support this opinion with evidence or show how he reached these conclusions, and his opinion was unsupported by the record as a whole.  (Tr. 25-26).

The ALJ assigned great weight to the opinion of Dr. Weitzner, the state

35

agency physician who filled out a Mental RFC questionnaire and opined that Plaintiff's mental disorders did not preclude her "from performing the basic mental demands of competitive work on a sustained basis."  (Tr. 26), citing (Tr. 576).  Dr. Weitzner's report was assigned lesser weight with respect to any assessments other than the narrative report because the narrative report was the best overall picture of this physician's opinion.  (Tr. 26).[10]

The ALJ also assigned great weight to the Dr. Weitzner's opinion from the Psychiatric Review Technique form regarding Plaintiff's activities of daily living and the lack of repeated episodes of decompensation because they were consistent with the record.  (Tr. 26).  The ALJ assigned more social function limitations than were offered in this opinion, and found that this physician's opinion regarding concentration, persistence and pace were overstated as they were inconsistent with and unsupported by the record.  (Tr. 26).

Upon review of the record, it is determined that the ALJ properly afforded weight to the opinions of Plaintiff's treating physicians.  Initially, with regards to Dr. Joshi, Dr. Taryham, and Dr. Bravein, it is determined that the ALJ was under

---

10. Regarding Plaintiff's assertion that the ALJ improperly afforded limited weight to one part of an opinion and then significant weight to another part of the same opinion, it is determined that the ALJ has the authority to do as long as the record supports the evaluation. See Jones v. Barnhart, 2005 U.S. Dist. LEXIS 17621, *18-19 (E.D. Pa. 2005).

no duty to give the opinions of these physicians controlling weight because these physicians were not considered to be treating physicians based on the factors listed in 20 C.F.R. § 416.927(d)(1)-(d)(6)[11] and the treating physicians' rule. In <u>Morris v. Barnhart</u>, the Third Circuit Court of Appeals further defined the continuing treatment element necessary for a treating physician's opinion to be given controlling weight when it held that because the plaintiff's treating physician had only seen the plaintiff on three (3) or four (4) occasions over a two (2) to three (3) month period, the continuing treatment was not present, and the ALJ was not obligated to give the physician's opinion any presumption of controlling weight. 78 F. App'x. 820, 823 (3d Cir. 2003). In this case, the record does not establish the continuing treatment element necessary for these physicians to be considered treating physicians. Therefore, in accordance with <u>Morris</u>, the ALJ had no obligation to give these physicians' opinions the presumption of controlling weight due to the lack of the continuing treatment element.

With regards to the opinions of Dr. Presner and Dr. Mira that Plaintiff was

---

11. The factors to be applied to determine the appropriate weight to be given to the treating physician's opinion are: (1) length of treatment relationship and frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion by relevant evidence or explanation, (4) consistency of the opinion with the record as a whole, (5) whether the treating physician is a specialist, and (6) other factors which tend to support or contradict the opinion. <u>See</u> 20 C.F.R. § 416.927(d)(1)-(d)(6).

disabled and severely limited, based on Plaintiff's own testimony, the ALJ was

correct that these opinions were not supported by the record and lacked an

explanation for the conclusions regarding Plaintiff's functional limitations because

the record reflects that these opinions overstated Plaintiff's limitations.  As

discussed, Plaintiff testified that she was able to do the following: (1) lift a

maximum of ten (10) pounds; (2) sit and stand for up to thirty (30) minutes at a

time; (3) climb stairs several times a day; (4) engage in overhead reaching with her

non-dominant hand; and (5) use her hands.  (Tr. 70, 78-79, 333).  Plaintiff also

reported that she could prepare meals, perform light housework, launder clothes,

care for her personal needs, shop for groceries, pay bills, count change, use a

checkbook, handle a savings account, read, watch television, and spend time with

her family.  (Tr. 328-332).  Plaintiff's niece, in a Third Party Function

Questionnaire, echoed Plaintiff's statements regarding activities that Plaintiff

could perform.  (Tr. 322).  These activities that Plaintiff testified that she was

capable of doing are in complete accordance with the restrictions provided by the

ALJ in the RFC determination, and thus support the weight the ALJ gave to the

opinions of Plaintiff's treating physicians.  Therefore, substantial evidence

supports the ALJ's decision to give limited weight to the opinions of Plaintiff's

treating physicians, including the opinion of Dr. Presner, because these opinions

were unsupported by and inconsistent with the record as a whole.

## 2. Vocational Expert Hypothetical

Plaintiff asserts that the ALJ posed an improper hypothetical to the VE because she failed to include all of Plaintiff's functional limitations in the hypothetical, including a "fingering and feeling" limitation, and greater limitations with regards to lifting, sitting, and standing. (Doc. 13, pp. 11-12).

A hypothetical question must include all of a claimant's functional limitations which are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 553-55 (3d Cir. 2004); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). One which omits limitations is defective, and the answer thereto cannot constitute substantial evidence to support denial of a claim. Id. However, "[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). When an ALJ's hypothetical question to a vocational expert sets forth the Plaintiff's limitations, as supported by the record, the vocational expert's response may be accepted as substantial evidence in support of the ALJ's determination that the Plaintiff is not disabled. See Chrupcala, 829 F.2d at 1276.

At the administrative hearing, the ALJ asked the VE if there were a

39

significant number of jobs in the national economy that Plaintiff could perform, given her age, education, work experience, and ability to perform light work with a sit/stand option every half hour, frequent fingering and feeling, rare overhead reaching with her non-dominant side, occasional kneeling and climbing of ramps and stairs, and avoidance of concentrated exposure to fumes, odors, gases, dust, chemicals or high temperatures, and for a person who had to work in small groups of less than five (5) people. (Tr. 107). The VE stated that such jobs did exist in significant numbers in the national economy that a person with these restrictions could perform, including employment as an information clerk, an injection molding machine tender, and a nut sorter. (Tr. 108-109).

As discussed, the ALJ's RFC determination is supported by substantial evidence because it is supported by the record, including Plaintiff's testimony as to what she could do. The functional limitations included in the RFC were all included in the hypothetical posed to the VE. (Tr. 25, 107). Therefore, the ALJ's hypothetical to the VE is supported by substantial evidence because it included all of Plaintiff's functional limitations that were supported by the record.

### 3.    ALJ's Interference with Questioning

Plaintiff contends that she did not obtain a fair hearing because the ALJ interfered with counsel's questioning of both Plaintiff and the VE. (Doc. 13, p.

13-14).  However, upon review of the administrative hearing transcript, it is determined that the ALJ complied with 20 C.F.R. § 404.950(e), which provides a claimant with the full and fair opportunity to be heard by permitting the ALJ and the parties' designated representatives to ask the witnesses material questions, because Plaintiff's attorney was not hindered from questioning either Plaintiff or the VE.  (Tr. 117-149).  Furthermore, it is determined that even if interference had occurred, the ALJ specifically stated that Plaintiff could return for a second hearing if her attorney so requested.  (Tr. 100-101).  Therefore, this argument is unfounded.

## CONCLUSION

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed, and the appeal will be denied.

A separate Order will be issued.

**Date**: October 31, 2014

_____
**United States District Judge**